## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JIANGSU BEIER DECORATION | : | |
| MATERIALS CO., LTD., | : | |
| Petitioner, | : | |
| | : | CIVIL ACTION |
| v. | : | No. 21-2845 |
| | : | |
| ANGLE WORLD LLC, | : | |
| Respondent. | : | |

**July 18, 2023**                                                    **Anita B. Brody, J.**

<u>**MEMORANDUM**</u>

This case is one front in a long-running commercial dispute between Jiangsu Beier Decoration Materials Co., Ltd. ("Jiangsu Beier" or "Jiangsu"), a manufacturer of flooring products, and Angle World LLC ("Angle World"), a distributor of those products. After a controversy arose between the firms, Jiangsu Beier initiated arbitration proceedings before the China International Economic and Trade Arbitration Commission ("CIETAC") and won a judgement against Angle World. Jiangsu moves to confirm that foreign arbitration award. I have jurisdiction under 28 U.S.C. § 1331 and 9 U.S.C. § 203.

**I.    BACKGROUND**

*A.  The Original 2016 Agreement and June 2018 Memorandum of Understanding*

In May 2016, Jiangsu Beier and Angle World negotiated and signed an exclusive distribution agreement. Opp'n (ECF 36) at 5.[1] Under the agreement's terms, Angle World would

---

[1] Following the Third Circuit's guidance, I rely throughout this memorandum on the parties' briefing and supporting documents. *See Jiangsu Beier Decoration Materials Co. v. Angle World LLC*, 52 F.4th 554, 560 (3d Cir. 2022) (instructing the court to "determine the merits of a confirmation petition on the record before it" and noting that the court's "review is not necessarily limited to factual allegations in the petition itself"). Citations to page numbers in ECF documents use the ECF pagination, not the pagination in the original document.

serve as the exclusive distributor of certain Jiangsu Beier-manufactured flooring products in Pennsylvania and several nearby states. *Id.*[2] But the parties' relationship soured. By June 2018, Jiangsu Beier alleges that Angle World was more than $1.3 million behind on payments for inventory that it had already delivered. Pet. Exs. (ECF 35-5) at 11. Angle World disputed that amount, claiming that Jiangsu Beier shipped nonconforming products and refused to honor end-customers' warranty claims. *Id.* at 8, 11; Opp'n (ECF 36) at 5.

To resolve these disputes, Jiangsu Beier and Angle World negotiated and signed a Memorandum of Understanding on June 28, 2018 ("the June MOU"). Pet. (ECF 35) at 3. The June MOU said that Angle World would make a series of payments to Jiangsu to cover the inventory that Jiangsu had shipped to Angle World, with deductions for the allegedly nonconforming or defective products. Pet. Exs. (ECF 35-5) at 8. These payments would total $528,227.59 over a six-month period, with $50,000 of that amount due upon the execution of the agreement. *Id.* The agreement did not set out the precise schedule for those payments. *Id.* And it did not contain an arbitration clause. *Id.*

### B. The July 2018 Negotiations

After signing the June MOU, the parties continued to negotiate a schedule for the payments due under the agreement. During these negotiations, Angle World was primarily represented by its President, Biao Wang, and its Chief Operating Officer, Jason Pyon. *See* Pet. Exs. (ECF 35-5) at 35, 42, 48-52. A declaration from Wang provides Angle World's account of the negotiations. Opp'n Exs. (ECF 36-1) at 2-4. Jiangsu Beier was primarily represented by Gracia Gao, whose title does not appear in the record, and "Camilla," a member of its International Marketing Department. *See id.* at 7; Pet. Exs. (ECF 35-5) at 42, 48-52. Neither submitted a declaration. Instead, Jiangsu's

---

[2] That original 2016 agreement is the subject of a separate case before me, *Angle World LLC v. Jiangsu Beier Decoration Materials Co., Ltd.*, No. 20-5939.

account is set forth in a declaration by Qianqian Gong, its Sales Director. *See id.* at 10-15.

The documentary record of the July negotiations begins on July 3, when a representative of Angle World emailed a representative of Jiangsu Beier with a payment schedule. *Id.* at 19. According to that schedule, Angle World would make six monthly payments of $87,000 between July and December 2018, totaling $522,000. *Id.* at 20. Wang of Angle World replied that the payment schedule "will be [an] attachment to our agreement as discussed." *Id.* at 21.

Seven days later, on July 10, a representative of Jiangsu Beier emailed a revised Memorandum of Understanding ("the Proposed July MOU") to a representative of Angle World. *Id.* at 23-26.[3] The Jiangsu representative resent a version of the Proposed July MOU on July 19. Opp'n Exs. (ECF 36-1) at 7.[4] The Proposed July MOU, unlike the June MOU, contained an arbitration clause. Pet. Exs. (ECF 35-5) at 4.

Here, the parties' accounts diverge. According to Angle World, Jiangsu Beier "unilaterally prepared and then sent" the Proposed July MOU "without discussing with" Angle World first. Opp'n (ECF 36) at 6. Accordingly, Angle World claims that it rejected the Proposed July MOU in a July 19 email, when Wang wrote that "[i]t has not been written in accordance with our negotiation." Opp'n Exs. (ECF 36-1) at 7. It says that it persisted in that rejection despite repeated requests from Jiangsu. *Id.* at 3.

Jiangsu Beier sees things differently. It claims that the Proposed July MOU was part of ongoing negotiations in which Angle World sought to revise the June MOU's terms. Pet. Exs. (ECF 35-5) at 11-12. Jiangsu further claims that, after Wang of Angle World rejected the Proposed

---

[3] Gong of Jiangsu Beier avers that the email was sent "on or about July 11, 2018." Pet. Exs. (ECF 35-5) at 12. The timestamp on the email indicates that it was sent on July 10. *Id.* at 23. The email and attachments are in Mandarin, and neither party provided the court with an English translation. Accordingly, the court must rely on the parties' characterizations of the email's content.

[4] Jiangsu Beier provided a version of this exchange in Mandarin. *See* Pet. Exs. (ECF 35-5) at 28-36. Angle World provided an English translation. *See* Opp'n Exs. (ECF 36-1) at 7.

July MOU in his July 19 email, the parties met in person, Wang signed a version of the Proposed July MOU, and it sent the Proposed July MOU via courier service to Angle World's office for final approval. *Id.* at 12-13.[5] No documentary evidence confirms that this meeting took place, that Wang signed the Proposed July MOU, or that Jiangsu Beier sent the Proposed July MOU to Angle World via courier service.

The documentary record picks up again later in July, when the parties agreed on a revised payment schedule. *Id.* at 42. Angle World made two payments to Jiangsu Beier, first on July 27 and then on September 7. *Id.* at 13-14, 46, 53. In late August and early September, while the parties were arranging for the second payment, a Jiangsu representative sent several emails to Angle World asking for the "signed agreement," presumably referring to the Proposed July MOU. *Id.* at 48-52. After September 2018, Angle World never made the remainder of the payments. *Id.* at 14. It claims that it stopped paying after it learned that Jiangsu Beier breached the original 2016 exclusive distribution agreement by selling directly to customers in the states covered by the agreement. Opp'n (ECF 36) at 7.

C. *The CIETAC Arbitration and This Action*

Seeking the remainder of the payments, Jiangsu Beier commenced arbitration proceedings in CIETAC in May 2019. Pet. (ECF 35) at 8. Both parties participated in a live hearing before CIETAC in September 2020. *Id.* Six months later, in March 2021, CIETAC found in Jiangsu Beier's favor and ordered that Angle World pay a judgement of $624,227.59, plus interest and attorneys' fees. *Id.* at 8-9. Angle World has not paid the CIETAC judgment. *Id.* at 9.

---

[5] Jiangsu's position on this sequence of events is inconsistent. Gong's declaration claims that Wang of Angle World signed the document at an in-person meeting, but that Jiangsu nevertheless sent a version of the document to Angle World's office to be signed. Pet. Exs. (ECF 35-5) at 13. Jiangsu also conceded before the Third Circuit and in earlier proceedings before me that Angle World never signed the Proposed July MOU. *Jiangsu Beier Decoration Materials Co. v. Angle World LLC*, 52 F.4th 554, 557 (3d Cir. 2022).

Angle World's nonpayment led to this action. In June 2021, Jiangsu Beier filed its initial petition to confirm the CIETAC award pursuant to the Convention on the Recognition and Enforcement of Foreign Arbitral Awards ("the New York Convention"). *Id.* Angle World filed a motion to dismiss under Fed. R. Civ. P. 12(b)(6), arguing that Jiangsu "did not and could not" supply an agreement to arbitrate that met the New York Convention's requirements. *Id.* In October 2021, I granted Angle World's motion and dismissed the petition. *Id.* at 11.

Jiangsu Beier appealed, and the Third Circuit vacated the order dismissing the petition and remanded the case for further proceedings. *Id.* at 11-13. It held that Rule 12(b)(6) was the wrong procedural posture for evaluating the petition. *Jiangsu Beier Decoration Materials Co. v. Angle World LLC*, 52 F.4th 554, 560-62 (3d Cir. 2022). Instead, the Third Circuit instructed, district courts must evaluate the whole record to determine whether the parties reached a valid agreement to arbitrate under the New York Convention. *Id.* at 560, 562-63. Following the Third Circuit's instructions, I ordered Jiangsu Beier to submit a renewed petition to confirm the CIETAC award. *See* Order (ECF 30) at 1.

## II.   DISCUSSION

Jiangsu Beier now renews its petition to confirm the CIETAC award. *See* Pet. (ECF 35). Angle World opposes this renewed petition. *See* Opp'n (ECF 36). For the reasons explained below, I will deny the petition and dismiss the case.[6]

### A.   Standard for Confirming a Foreign Arbitration Award

"The New York Convention, as implemented by Chapter 2 of the Federal Arbitration Act

---

[6] Angle World cross-moves for summary judgment. But "petitions to confirm or vacate arbitration awards are summary proceedings that do not require the district court to carry on a formal judicial proceeding." *CPR Mgmt., SA v. Devon Park Bioventures, LP*, 19 F.4th 236, 244 (3d Cir. 2021) (cleaned up); *see also Ottley v. Schwartzberg*, 819 F.2d 373, 377 (2d Cir. 1987) ("Actions to confirm arbitration awards . . . are straightforward proceedings in which no other claims are to be adjudicated."). Because my denial of Jiangsu Beier's petition disposes of the case, I will deny Angle World's cross-motion as moot.

('FAA'), permits the recipient of a foreign arbitration award to petition a district court to enforce it." *Jiangsu Beier*, 52 F.4th at 559. "Before confirming a foreign award, however, a district court must independently assure itself that the parties consented to arbitrate the merits of their underlying dispute." *Id.* This is because "arbitration is a matter of contract," meaning "a party can be forced to arbitrate only those issues it specifically agrees to submit to arbitration." *China Minmetals Materials Imp. & Exp. Co. v. Chi Mei Corp.*, 334 F.3d 274, 283-84 (3d Cir. 2003).

In general, parties seeking confirmation of foreign arbitration awards under the New York Convention must satisfy "a burden-shifting framework." *Jiangsu Beier*, 52 F.4th at 561. First, the party seeking confirmation must supply both (1) the arbitration award and (2) "[t]he original agreement referred to in article II or a duly certified copy thereof." New York Convention, art. IV, June 10, 1958, 21 U.S.T. 2517, T.I.A.S. No. 6997.[7]

This case turns on Article IV's second threshold requirement: that the party seeking confirmation supply "[t]he original agreement referred to in article II." *Id.* art. IV. Article II of the Convention refers to an "agreement in writing," which means an "arbitral clause in a contract or arbitration agreement, signed by the parties or contained in an exchange of letters or telegrams." *Id.* art. II. "Reading Articles II and IV together," therefore, "proof of 'the agreement referred to in article II,' i.e., an 'agreement in writing,' is an essential prerequisite to the recognition and enforcement of an award under the New York Convention." *Jiangsu Beier*, 52 F.4th at 561.[8]

Here, Jiangsu concedes that the agreement it provided is "unsigned." Pet. (ECF 35) at 2

---

[7] After those threshold requirements are satisfied, the party resisting confirmation may raise one of five affirmative defenses set out in the Convention. New York Convention, art. V, June 10, 1958, 21 U.S.T. 2517, T.I.A.S. No. 6997.
[8] By "[r]eading Articles II and IV together," *Jiangsu Beier*, 52 F.4th at 561, the Third Circuit endorsed a concurring opinion by then-Judge Samuel Alito in *China Minmetals Materials Import & Export Co. v. Chi Mei Corp.*, 334 F.3d 274 (3d Cir. 2003). In that concurrence, then-Judge Alito argued that "a party seeking enforcement of an arbitral award under Article IV must supply the court with an 'agreement in writing' within the meaning of Article II." *Id.* at 293 (Alito, J., concurring). In this case, the Third Circuit "f[ound] Justice Alito's textual analysis persuasive . . . and . . . concluded a party must supply proof of a written agreement to obtain enforcement under the New York Convention." *Jiangsu Beier*, 52 F.4th at 561 n.30.

n.1. So the arbitral clause in the contract must be "contained in an exchange of letters or telegrams" to be enforceable under the Convention. *See Jiangsu Beier*, 52 F.4th at 561. Though "[t]he New York Convention does not define the phrase 'exchange of letters' . . . such an exchange must at minimum demonstrate an 'agreement' between the parties, that is, a manifestation of mutual assent to be bound by a contract containing an arbitration clause." *Id.*; *see also AGP Indus. SA, v. JPS Elastromerics Corp.*, 511 F. Supp. 2d 212, 215 (D. Mass. 2007) ("The phrase 'exchange of letters or telegrams' suggests a level of interchange that is not present during a mere exchange of forms.").

To determine whether the parties agreed to be bound by a contract with an arbitration clause, courts rely on "background principles of contract law, to the extent those principles do not conflict with the New York Convention." *Jiangsu Beier*, 52 F.4th at 561-62 (internal quotation marks omitted); *see also GE Energy Power Conversion Fr. SAS, Corp. v. Outokumpu Stainless USA, LLC*, 140 S. Ct. 1637, 1645 (2020) (noting that "the provisions of Article II contemplate the use of domestic doctrines to fill gaps in the Convention"). Applying these background concepts to the "exchange of letters" inquiry accords with a broader principle in arbitration law: that "[w]hen deciding whether the parties agreed to arbitrate a certain matter . . . courts generally . . . should apply ordinary state-law principles that govern the formation of contracts." *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995).[9] I will therefore apply Pennsylvania law to

---

[9] Jiangsu Beier argues that the Court must apply Chinese law to determine whether the parties agreed to arbitrate and "defer" to the findings of CIETAC and a Chinese court on the issue. Pet. Resp. (ECF 38) at 14-17. But the Third Circuit already rejected a version of that argument. It held that the court "should not . . . defer to a foreign panel's finding of arbitrability" and noted that the Chinese court did not decide the questions at issue here: "(a) whether an arbitration award would be subject to confirmation in a foreign nation under Article IV of the New York Convention or (b) whether the parties' email exchange satisfies the 'writing' requirement of Article II." *Jiangsu Beier*, 52 F.4th at 563. In any event, Jiangsu's additional arguments on this point fail. First, Jiangsu argues that the court must apply Chinese law because some of the events at issue took place in China. Pet. Resp. (ECF 38) at 15, 17. But doing so would contravene the general rule that "ordinary state-law principles" govern questions of arbitrability. *First Options*, 514 U.S. at 944. Second, it argues that "Article V(1)(a) requires that the analysis of the agreement to arbitrate be made under the law of the country where the award was made." Pet. Resp. (ECF 38) at 17. This case, however, is not about Article V's affirmative defenses to enforcement, but rather about Article IV's threshold requirements.

determine whether the parties agreed to arbitrate. *See Standard Bent Glass Corp. v. Glassrobots Oy*, 333 F.3d 440, 444 n.7 (3d Cir. 2003) (applying Pennsylvania law in a New York Convention case); *Universal F. of Cultures Barcelona 2004, S.L., in liquidation v. Council for a Parliament of the World's Religions*, No. 12-3542, 2013 WL 1196607, at *3 (N.D. Ill. Mar. 21, 2013) (applying Illinois law).

Most relevant to this inquiry are foundational contract principles of offer and acceptance, familiar even to "first-year law student[s]." *Fletcher-Harlee Corp. v. Pote Concrete Contractors, Inc.*, 482 F.3d 247, 250 (3d Cir. 2007). Under these principles, "[i]t is a requisite of every contract that there must be an offer and acceptance." *Farren v. McNulty*, 121 A. 501, 502 (Pa. 1923). An offer and acceptance may be conveyed through a series of communications, but "the minds of the parties must meet on every point presented in the offer." *Clements v. Bolster*, 6 Pa. Super. 411, 418 (1898). Put differently, there must be "a definite and unqualified proposal by one party which was unconditionally and without qualification accepted by the other party." *Dougherty v. Briggs*, 79 A. 924, 926 (Pa. 1911). This acceptance must be conveyed to the party making the offer, *Huber Mfg. Co. v. Smithgall*, 19 Pa. Super. 641, 643 (1902), and "[s]ilence will not constitute acceptance of an offer in the absence of a duty to speak," *Solis-Cohen v. Phoenix Mut. Life Ins. Co.*, 198 A.2d 554, 555 (Pa. 1964).[10] In sum, Angle World must have plainly and unconditionally accepted the agreement proffered by Jiangsu Beier through some affirmative communication.

In addition, the New York Convention, which controls to the extent that it conflicts with background principles of contract law, *see Jiangsu Beier*, 52 F.4th at 561-62, requires a signed

---

[10] These Pennsylvania contract principles are largely consistent with those set out in the Second Restatement of Contracts. *See* Restatement (Second) of Contracts § 17 (1981) ("[T]he formation of a contract requires a bargain in which there is a manifestation of mutual assent to the exchange . . . ."); *id.* § 22 ("The manifestation of mutual assent to an exchange ordinarily takes the form of an offer or proposal by one party followed by an acceptance by the other party or parties."); *id.* § 50 ("Acceptance of an offer is a manifestation of assent to the terms thereof made by the offeree in a manner invited or required by the offer."); *id.* § 69 (setting out the exceptional circumstances in which a party's silence may constitute acceptance).

agreement or an "exchange of letters or telegrams," New York Convention, art. II, June 10, 1958, 21 U.S.T. 2517, T.I.A.S. No. 6997. This requirement suggests that the offer and acceptance must be conveyed in writing. *See Standard Bent Glass Corp. v. Glassrobots Oy*, 333 F.3d 440, 449 n.14 (3d Cir. 2003) ("In requiring an agreement in writing, article II, section 2 of [the New York Convention] prohibits the enforcement of an oral agreement to arbitrate an international dispute."); *Dynamo v. Ovechkin*, 412 F. Supp. 2d 24, 29 (D.D.C. 2006) (rejecting the argument that Article II could be satisfied "absent a written exchange demonstrating both parties' agreement to arbitrate with one another").

The court makes these determinations by reference to the entire record, not just the four corners of the petition to confirm the award. *Jiangsu Beier*, 52 F.4th at 560. Mindful that "petitions to confirm . . . arbitration awards are summary proceedings that do not require the district court to carry on a formal judicial proceeding," *CPR Mgmt., SA v. Devon Park Bioventures, LP*, 19 F.4th 236, 244 (3d Cir. 2021) (cleaned up), I must rely on the evidence that the parties provide.[11]

### B. Application to the Record

After reviewing "the record before [me]," *Jiangsu Beier*, 52 F.4th at 560, including the parties' submissions and supporting documents, I conclude that Jiangsu Beier has not established the "exchange of letters" that is an "essential prerequisite" for enforcement under the New York Convention, *id.* at 561.

I begin with the parties' declarations. These documents—one from Jiangsu Beier Sales Director Qianqian Gong and the other from Angle World President Biao Wang—are alone insufficient to show that the parties agreed to arbitrate through an exchange of letters. But they

---

[11] The Third Circuit noted that "further proceedings may be necessary to resolve a material factual dispute," but that the court "often can, within its discretion, decide an FAA motion without conducting a full hearing or taking additional evidence." *Jiangsu Beier*, 52 F.4th at 560 (cleaned up). Because neither party has requested a hearing or indicated that a hearing would uncover additional relevant evidence, *see* Opp'n (ECF 36) at 10, I decline to hold one.

usefully frame the documentary record by laying out the parties' competing accounts of the negotiations in June and July 2018. They are flatly contradictory. According to Gong, Jiangsu Beier sent the Proposed July MOU to Angle World after an in-person meeting where the parties discussed revising the terms of the earlier June MOU. Pet. Exs. (ECF 35-5) at 12. Gong claims that Angle World responded to the Proposed July MOU in a July 19 email, in which it "sa[id] that Angle World would need to confirm the terms of the MOU" with one of its executives. *Id.* After this email, Gong says that the parties "met again face-to-face . . . and agreed to the terms of settlement," that Wang of Angle World signed a hard copy of the Proposed July MOU in the margin, and that Jiangsu sent a copy of the Proposed July MOU to Angle World. *Id.* at 12-13. Wang, in contrast, says that he "reviewed the July 10 MOU on July 19, 2018 and found an arbitration clause in it," a discovery that came as a surprise because "Angle World and [Jiangsu Beier] had never discussed or negotiated adding an arbitration clause." Opp'n Exs. (ECF 36-1) at 3. He therefore "responded to [Jiangsu Beier's] email and explicitly told [Jiangsu] that the July 10 MOU was not written in accordance with [the parties'] negotiation." *Id.* "Since then, [Jiangsu] ha[s] requested [that] Angle World . . . sign the July 10 MOU, but Angle World rejected the requests." *Id.*

To assess these conflicting accounts, I next turn to the documentary evidence submitted by the parties: emails, email attachments, and other materials from the 2018 negotiations. The most important characteristic of this documentary record, though, it what it is missing: any written exchange showing that Angle World affirmatively agreed to the Proposed July MOU and its arbitration clause—under Pennsylvania contract principles or, for that matter, any reasonable definition of the term "agreement." *See Jiangsu Beier*, 52 F.4th at 562 n.32 (suggesting that "the choice of law [may] not materially affect the result" in this case). This absence is fatal.

The most significant piece of documentary evidence that Jiangsu can point to is a copy of the Proposed July MOU that it alleges was signed in the margin by Wang of Angle World. Pet. Exs. (ECF 35-5) at 13. But Angle World contests that account. *See* Opp'n Exs. (ECF 36-1) at 3. And after reviewing the document itself, the court cannot identify any marks appearing to be the signature or seal of Wang or any other Angle World representative. Pet. Exs. (ECF 35-5) at 38-40. Jiangsu further claims that the parties agreed to the Proposed July MOU at the face-to-face meeting. *Id.* at 12-13. But even if this were true, the New York Convention "prohibits the enforcement of an oral agreement to arbitrate an international dispute." *Standard Bent Glass Corp. v. Glassrobots Oy*, 333 F.3d 440, 449 n.14 (3d Cir. 2003).

Further underscoring Jiangsu's failure to meet its burden is the record evidence indicating that the parties did *not* reach an agreement on the Proposed July MOU and its arbitration clause. First, and most significantly, Wang of Angle World sent an email explicitly rejecting the Proposed July MOU. *See Jiangsu Beier*, 52 F.4th at 563 n.36 ("[T]here is record evidence that could be read to suggest that . . . Angle World at least initially rejected the terms of the July MOU."). In that email, Wang wrote that the Proposed July MOU "has not been written in accordance with [the parties'] negotiation," and that "[i]t has exceeded the scope of [his] capacity in terms of negotiating with both parties." Opp'n Exs. (ECF 36-1) at 7.[12] Similarly, the emails discussing the payment schedule suggest that the parties never reached an agreement to arbitrate. In an email thread on July 3, before Jiangsu sent the Proposed July MOU, Wang wrote that a proposed payment schedule "will be [an] attachment to our agreement as discussed," presumably referring to the previously negotiated June MOU. Pet. Exs. (ECF 35-5) at 21. Later in July, after Jiangsu sent the Proposed

---

[12] The credibility of Qianqian Gong's declaration is undermined by its characterization of that crucial email. In the declaration, Gong neglects to mention the part of Wang's email in which Wang rejected the Proposed July MOU as inconsistent with the parties' negotiations. Pet. Exs. (ECF 35-5) at 12.

July MOU, the parties continued the July 3 email thread and communicated their agreement on a new payment schedule without referencing the Proposed July MOU at all. *Id.* at 42. Finally, emails from Jiangsu in August and early September repeatedly ask Angle World to "sign[] the agreement," suggesting that Angle World never acceded to the Proposed July MOU. *Id.* at 48-50. This evidence all points to the same inescapable conclusion: that despite getting a second bite at the apple, Jiangsu Beier has failed to show that the parties agreed to arbitrate through an exchange of letters.

## III.    CONCLUSION

For the reasons discussed above, the petition to confirm the arbitration award will be denied. An appropriate order follows.

s/ANITA B. BRODY, J.

_____

ANITA B. BRODY, J.